J. GORDON S. and DONNA R. HARRIS, ET AL., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harris v. Commissioner
Docket Nos. 19617-80, 26682-81
United States Tax Court
T.C. Memo 1983-774; 1983 Tax Ct. Memo LEXIS 10; 47 T.C.M. (CCH) 760; T.C.M. (RIA) 83774; December 27, 1983. *10 Petitioner acquired 82 subdivided lots in North Dallas between 1973 and 1978. During the same period he sold 48 of these lots, 22 of them being sold with either a "speculative" home on it or with a contract for construction of a home by petitioner, and 26 being sold outright with no improvements built thereon by petitioner. Petitioner sold 19 lots outright during the years in issue, including 10 in 1976, 3 in 1977, and 6 in 1978. Held: Gains on the sale of the 19 lots sold outright were taxable as ordinary income. J. Gordon S. Harris, pro se. Gary A. Benford, for respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These cases were consolidated for trial pursuant to the provisions of Rule 141(a). [1]
Respondent determined deficiencies in petitioners' Federal income tax as follows: Taxable Year Ended Dec. 31
Deficiency
1976
$8,083.70
1977
4,340.50
1978
7,406.00
After concessions by the parties, the issue remaining for decision is whether for each of the taxable years in issue the gain recognized from the sale of lots is reportable as capital gain or ordinary income. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits *12 attached thereto are incorporated by this reference. Petitioners J. Gordon S. Harris and Donna R. Harris, husband and wife, resided in Richardson, Texas, at the time of filing the petition herein. They filed their joint Federal income tax returns for each of the taxable years in issue with the Internal Revenue Service, Austin, Texas. Donna R. Harris is a party herein solely by virtue of having filed a joint return with J. Gordon S. Harris (hereinafter petitionere. Petitioner, a certified public accountant, worked in the accounting profession from 1959 until August 1971. Sometime in late 1971 or early 1972, petitioner developed an interest in the real estate business. A friend of petitioner who built residential homes encouraged petitioner to become a home builder. After studying his friend's business, petitioner decided to follow his advice. Petitioner began his business in 1972 by purchasing two subdivided, improved lots in North Dallas. Petitioner built a house on each lot and sold the houses and lots in 1972. Petitioner financed the purchase of the lots and the construction of the houses with loans from a local savings and loan association. Buoyed by the sale of *13 these two homes, petitioner began to expand his business in 1973. Between 1973 and 1978, petitioner purchased 82 lots. Each of these lots had similar characteristics: they were located in the North Dallas area; they were suitable only for residential home building; they were "improved" lots (i.e., houses could immediately be built upon them). Most of them were "prime" lots. Petitioner immediately started selling these lots. Petitioner would sell a lot in one of three ways: he would build a speculative home [3] on the lot and then sell the home and the lot together; or he would sell the lot and build a home on the lot to the purchaser's specifications; or he would sell the lot outright to another builder or individual. Occasionally petitioner built a speculative home on a less valuable lot in a development in order to increase the value of his other lots in the development. At the time petitioner purchased a lot he did not know whether it would be sold outright or whether he would build a house on it.The lots were not purchased for a specific *14 purpose; nor were they initially segregated as to intended use on petitioner's books and records. Petitioner did not report a lot as inventory for income tax purposes until he commenced construction of a house thereon. Petitioner was willing to sell any lot -- with or without a house or a contract to build a house on it -- at any time provided the offer was a reasonable one. Lots sold during the years in issue were held by petitioner for an average of 25 months. As of December 31, 1978, the disposition of the 82 lots purchased between 1973 and 1978 were as follows: 22 lots had been sold with either a speculative home or with a contract for the future construction of a home by petitioner; 26 lots had been sold outright; 34 lots were still owned by petitioner. During the years in issue, petitioner sold 19 lots outright, including 10 in 1976, 3 in 1977, and 6 in 1978. Petitioner reported gross sales from his home building business of $407,637 for 1976, $770,906 for 1977, and $930,804 for 1978. Petitioner reported net losses from his home building business of $25,187 for 1976, $5,160 for 1977, and $27,878 for 1978. Petitioner deducted all of the costs associated with a lot, *15 including interest expense, real estate taxes and maintenance expenses, whether the lot was used by petitioner to construct a home thereon or was sold outright, as business expenses on Schedule C of his returns. Petitioner did not use the services of a real estate agent to sell any of the lots nor did he advertise any of the lots as being "for sale." However, petitioner did place business signs on the lots which listed petitioner's name, phone number, the fact that he built custom homes, and that he was a member of the National Association of Homebuilders. Petitioner also advertised in magazines and newspapers to promote himself as a builder, and to publicize particular homes. During the years in issue, petitioner reported as ordinary income the gain he received from the sale of lots with homes (whether existing houses or houses to be custom built). During the years in issue, petitioner reported the amounts received for the sale of the 19 lots outright as capital gain. The amounts reported as capital gains (exclusive of the section 1202 [4] deduction) were $66,951, $31,607, and $80,143 for the years 1976, 1977, and 1978, respectively. *16 In his statutory notice of deficiency, respondent determined that the gain realized in respect of each of these 19 lots was ordinary income. There is no dispute between the parties concerning the sale of the lots with houses, or on the amount of gain realized on the sale of the 19 lots; only the character of the gain realized on the 19 lots is in issue. OPINION Petitioner's position is that the 19 lots were held for investment and not for sale to customers in the ordinary course of a trade or business. To support his position, petitioner relies on a variety of factors; for example, the lots were never represented as being for sale, bare lots were not included as inventory on his books and records, he purchased far more lots than he could build homes on, and he did not improve the lots in order to resell them for a profit. Respondent, on the other hand, argues that in addition to selling lots with houses, petitioner was also engaged in the business of selling lots outright. Petitioner is entitled to capital gains treatment on the income derived from his lot sales only if such lots were "capital assets." See section 1222. Generally, section 1221 defines a capital asset *17 as any property held by a taxpayer, whether or not connected with the taxpayer's trade or business. This definition is subject to certain exceptions, including "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Section 1221(1).The purpose of this exception is to "differentiate between gain derived from the everyday operations of a business and gain derived from assets that have appreciated in value over a substantial period of time." , affd. . Further, the word "primarily," as used in section 1221(1) means "of first importance" or "principally." . Whether property is excluded from capital asset status by virtue of section 1221(1) is a question of fact. , affg. . While many factors have been considered by the courts in determining whether real property was held primarily for sale to customers in the ordinary course of a trade or business, see *18 , the circumstances in each case are of prime concern. Although the purpose for which the property was acquired, and the taxpayer's intent with respect thereto, is one factor to be considered, the taxpayer's actions with respect to the property while he owns it and the purpose for which he is holding it at the time of sale may be of even greater importance. , [appeal dismissed per stipulation (7th Cir. 1962)]; , cert. den. . For several reasons we think the lots sold by petitioner outright, being those here involved, were acquired and held by petitioner primarily for sale to customers in the ordinary course of his business. Petitioner claims his business was homebuilding but the evidence indicates he was also in the business of selling lots outright. None of the lots petitioner acquired were bought to be used for a specific purpose, except all were bought for resale. This was accomplished by either building a home on a lot and selling *19 both house and lot, or by selling a lot to a buyer together with a contract to build a house on it to the buyer's specifications, or by selling a lot outright with no house or contract to build a house on it. On course, petitioner would choose the lot upon which he would build a "speculative" house, but the buyers chose the lots upon which a house was to be built or which the buyer bought for reasons and purposes of his own. Petitioner was willing to sell any lot he had on hand at any time the price was right with no conditions as to what it was to be used for. It was not until petitioner received an offer to buy a particular lot that there was a differentiation between the lots on petitioner's books. It was only when construction was started on a lot that that lot was placed in inventory. But placing a lot in inventory did not change the character of the lot; it simply meant that that lot was no longer available for sale. The remaining lots were still available for sale in the ordinary course of petitioner's business. It may be that petitioner hoped the value of the unsold lots would increase with time but no particular lots were selected for that purpose -- none were specifically *20 set aside as investment vehicles. Although petitioner did not advertise lots as being "for sale" or use the services of real estate brokers, petitioner did advertise that he was a homebuilder and that he owned lots. We believe that this advertising led to alerting others that petitioner did own lots and that petitioner was willing to sell them outright. Also, petitioner points to the fact that he did not improve or subdivide the lots that he sold.However, the lots were ready to have houses built upon them when they were purchased by petitioner; there was no "improving" to be done. [5]
Finally, and most importantly, the sales were frequent and substantial. [6] Between 1973 and 1978, of the 48 lots petitioner sold, 26 were sold outright. During the years in issue, petitioner sold 10 lots in 1976, 3 lots in 1977, and 6 in 1978, and reported capital gains from those lots of $66,951, $31,607, and $80,143, respectively. These facts establish that petitioner was *21 engaged in selling lots to customers in the ordinary course of a trade or business. , (amounts received from just over three sales per year over a ten-year period determined to be ordinary income), cert. denied ; (amounts received from ten sales during two-year period constituted ordinary income). In sum, whether we consider petitioner to have been engaged in one business with two segments, selling lots with houses and selling lots outright, or in two businesses, one selling lots with houses and, two selling lots outright, makes no difference. In either case, petitioner was selling real estate to *22 customers in the ordinary course of his trade of business. Accordingly, respondent must be sustained on this issue. [7]
Because of concessions by the parties Decision will be entered under Rule 155.
Footnotes
1. All references to "Rules" shall refer to the Tax Court Rules of Practice and Procedure.↩
2. In his original brief respondent conceded that losses incurred by petitioner in 1977 upon the expiration of cocoa and sugar options were ordinary losses, as claimed by petitioner, rather than capital losses, as determined by respondent in the notice of deficiency.↩
3. A "speculative house" is a house constructed for no one particular buyer, but with the hope that it will be sold upon completion.↩
4. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
5. Petitioner did occasionally build speculative homes on certain lots to increase the desirability and value of the surrounding lots. In this sense, petitioner did "develop" his lots for increased sales and profit.↩
6. This Court and others have held that the frequency and substantiality of sales is the most important factor in determining whether the sale of real estate occurs in a trade or business. See, e.g., , cert. denied ; .↩
7. We do not mean to imply that a "home builder" cannot acquire unimproved property and hold if for investment purposes. However, if he wants to realize capital gains on the sale of such property he should clearly differentiate the property he buys and holds for investment and the property he buys for home building purposes. This is particularly true if he holds the investment property for relatively short periods of time and his sales of that property are frequent. The sale of 19 lots over a three year span can constitute a business for a home builder just as it could constitute a business for some one engaged in an unrelated business.↩